## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | NO. 3:19CR157 (AWT) |
|---|---|---|
| v. | : | |
| JOHN MATTHEWS | : | SEPTEMBER 16, 2021 |

### REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM

The government essentially asserts three reasons it believes justify a 175 month sentence (just 5 months less than 15 years of incarceration) for John Matthews: (1) one of his customers, who like most drug users had multiple sources of supply, died tragically of an overdose (Govt. Memo at 1-5); (2) there is a special need to punish John in this case, given his prior record and conduct in this case (Govt. Memo at 6-7); and (3) a sentence of almost 15 years is justified by the notions of general and specific deterrence (Govt. Memo at 8). As will be expanded upon below, the United States is currently in the middle of a drug epidemic and the level of overdose deaths in our country constitutes a major public health crisis. The question for the Court, however, is what sentence should be given in this particular drug distribution case. We respectfully submit that a sentence of 120 months, or 10 years, is a very lengthy sentence for a distribution offense, and based upon all the facts and circumstances here is "sufficient but not greater than necessary."

**I.    The Overdose That Occurred Here Is Not A Proper Basis to Elevate The Sentence Above 10 Years.**

As part of the plea agreement in this case, the government agreed to dismiss the charge that alleged that J.C.'s death resulted from John's drug distribution activity

1

(Count Three of Indictment). As previously noted, the parties disagree on the sufficiency of the evidence to establish causation here. The PSR does not make a causation finding, and the government has no objections to the PSR (Govt. Memo at 5). Still, the government is effectively asking the Court to sentence John *as if* he had caused the death. If it had been pursued, a conviction on Count Three would have required a 20-year sentence. The government argues here that the Court should use J.C.'s overdose death as a basis to increase John's sentence by almost five years (55 months), from 120 months to 175 months. This is an invitation that the Court should reject.

As the Court is well aware, the number of overdose deaths in our country continues to rise. In 2018, the year J.C. died as a result of an overdose, there were approximately 67,367 drug overdose deaths in the United States.[1] During that same year, the rate of drug overdose deaths involving synthetic opioids, such as fentanyl, increased by 10%.[2] The number of drug overdoses has continued to rise every year, with 2020 being the deadliest year on record. In Connecticut there were 1,202 drug overdose deaths in 2019, and the death rate rose by 14.3% in 2020, with a total of 1,373 overdose deaths.[3]

---

[1] *See* National Center for Health Statistics, https://www.cdc.gov/nchs/products/databriefs/db356.htm (last visited September 9, 2021)

[2] *See id.*

[3] *See* https://portal.ct.gov/-/media/DPH/Injury-Prevention/Opioid-Overdose-Data/Monthly-Death-Reports/March-2021_2020-and-2019-Drug-Overdose-Deaths-Monthly-Report_CT_Updated-4_12_2021.pdf.

Of course, not every person who takes a drug will overdose, and not all who overdose will die. There are several risk factors that can increase a person's risk of overdosing, including changes in tolerance (i.e., going from not using or using less to using an increased amount), having other health issues, or having survived a past overdose.[4] In one study, published in 2003 by the National Library of Medicine, it was observed that patients who successfully completed inpatient detoxification were more likely than other patients to have died within a year.[5] There are also several harm reduction strategies, which are advised to be implemented to help prevent an overdose from occurring or becoming fatal. One of the most important is using narcotics only when someone else is around so that in the event of an overdose, a call for help can be made.

Every life lost to an overdose is a tragedy. On November 1, 2018, J.C. lost his battle with addiction. After struggling for years through periods of sobriety and relapse, he used narcotics in his home by himself, after his wife had left for rehab. Given that the parties disagree about whether there is sufficient evidence to conclude that J.C.'s death "resulted from" drugs supplied by John in this case, and because the government is dismissing Count Three (Distribution of Controlled Substance Resulting in Death), this Court need not make a finding about whether or not drugs supplied by John resulted in J.C.'s death.

---

[4] *See* "Opioid Overdose Risk Factors," https://www.mass.gov/service-details/opioid-overdose-risk-factors (last accessed September 9, 2021).

[5] *See* "Loss of Tolerance and Overdose Mortality After Inpatient Opiate Detoxification: Follow up Study," BMJ. 2003 May 3; 326(7396): 959–960. Study can be accessed at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC153851/#B3

One of the heartbreaking realities of addiction is that the person fighting addiction knows that each time they use a potentially lethal narcotic it could be their last. Although the government notes that J.C.'s wife reported that he had been "sober for several months" and that "she had used all of the narcotics in the home before her departure" (Govt Memo at 2), there are numerous indications from J.C.'s text messages that he was using drugs, and indeed seeking drugs from sources other than John, in the weeks leading up to his death. Indeed, on October 13, 2018, just a few weeks prior to his death, the text messages show that J.C. used drugs, overdosed, and nearly died at the hospital. What these text messages show is that addiction is a difficult disease, and the journey to sobriety is not an easy one, oftentimes marred by periods of relapse. It also underscores the gaps in evidence that preclude a determination of causation. While it appears J.C. told his wife he had remained sober, the reality was different. Substantial questions remain regarding what other suppliers he purchased drugs from in the days and hours prior to his death, when those purchases were made, and when he used those drugs.

The science behind an overdose and overdose deaths is nuanced, and there is a whole host of factors that are at play. It cannot be denied, however, that there is a randomness to it all. Whether or not a person dies of an overdose on a particular occasion may hinge on whether he or she was lucky enough to have someone present during use who identified the signs and called for help. Another factor is the person's tolerance levels, and whether they had used in the days and weeks prior. Of course, another factor is the particular "batch" of the narcotic itself, although not all people will react similarly to the same "batch".

4

The government notes that John is a "grown man of thirty-six...and...is alone responsible for his choices." (Govt. Memo at 7). John has taken full responsibility for his actions in this case, and does not dispute or try to downplay that his distribution of drugs was harmful to others and our communities. It is respectfully submitted, however, that John is not the only adult in this situation. All parties involved in the distribution and use of drugs make choices. Addiction is a disease and people who are addicted will sometimes go to great lengths to obtain narcotics. Indeed, many of John's customers, like J.C., had multiple sources of supply and would simply purchase from someone else if John was not available. And, similar to J.C., John had his own ongoing drug addiction issues at the time. It is respectfully submitted that relative culpability of a person distributing narcotics and the appropriate criminal sentence must be analyzed with all these factors in mind.

This was the first case in this District in which the government charged the mandatory minimum 20-year "results in death" offense. Our research of numerous prior cases involving drug overdoses in this District indicates that the majority of those cases resulted in sentences of less than 60 months. Very few approach the magnitude of the 120 month sentence advocated for here by John, let alone the 175 months sought by the government. While each case is different, the extreme differences between what the government is advocating for here, when compared to other cases where an overdose(s) occurred, is a factor that supports a 120-month sentence.

## II. The Goal of Punishment Would Be Satisfied Here By The Imposition Of A 120-Month Sentence.

Overall, 88.3% of all federal prison sentences imposed in 2020 were for terms of

less than 10 years. In that same year, the average length of all federal drug sentences was 40 months.[6] As a result, the 120-month sentence we are requesting here is in the top 12% of all federal sentences in terms of length.

On the date of the sentencing hearing, which is scheduled for September 30, 2021, John will have served a total of 963 days, or 31 months and 20 days, in pre-trial custody at Bridgeport Correctional. The parties agree that the Court should take a two-step approach to sentencing in this case: (1) determine the appropriate length of sentence in this case, without factoring into that determination the period of time spent in pretrial custody; and (2) deduct from that sentence the total period of pretrial time set forth above. Given the uncertainties regarding whether or not the BOP will award John credit for this pretrial time, the parties have concluded that this approach is appropriate, and will ensure credit for this pre-trial time.[7]

As noted in the initial memorandum, John has spent this time doing a great deal of soul-searching. He has reflected on his life, and the decisions he has made, and is committed to turning his life down a different path. For much of his adult life, John has been a street-level drug dealer. The government makes a point to note the number of

---

[6] *See* United States Sentencing Commission, Overview of Federal Criminal Cases, can be accessed at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/FY20_Overview_Federal_Criminal_Cases.pdf, at p. 9.

[7] This is a modified approach to the credit issues than was suggested in our initial memorandum, based upon ongoing discussions with the government. The government incorrectly notes in footnote 2 that John was expected to receive a 30-month state sentence. John's agreed-upon sentence in state court, however, which is not yet in effect, is 8 years concurrent to his federal sentence. As noted in our earlier sentencing memorandum, this will result in the lodging of a Connecticut state detainer for much of his period of incarceration in BOP custody, and will make that time far more harsh.

baggies that were found in his vehicle at the time of his arrest (247 total). While a seemingly large number, the total weight of narcotics found in his vehicle amounts to less than 8g. This amount and the way the narcotics were packaged evidences street-level sales, not large scale drug distribution.

Further, the government argues that John's criminal history is a factor that supports the imposition of a 175-month sentence, at the very top of the agreed-to range (Gov't Memo. at 7). While John's criminal history is nothing to celebrate, and he is ashamed of it, it should be noted that he has never been convicted of assaultive/violent behavior, and has never been arrested for firing or otherwise using a firearm.

In addition to the period of incarceration imposed by the Court, John will be required to complete a supervised release term of no less than three years. He knows that if he goes back into the drug world after his release, he faces the likelihood of spending much of the rest of his life in prison. In addition to any sentence he might receive for subsequent criminal conduct, this Court will be in a position to impose an additional period(s) of incarceration for any violation, especially one involving new criminal conduct, and it is extremely likely the Court would do just that. For these reasons, the goal of punishment will be more than adequately met by a 10-year sentence followed by a three year period of supervised release.

### III. The Goals of Individual and General Deterrence, To The Degree Applicable, Will Be Satisfied By A 120-Month Sentence.

There is no reason to conclude that a 175-month sentence will specifically deter John from engaging in future criminal conduct, but a 120-month sentence will not. The past 32 months John has spent in custody during the Covid-19 pandemic have been a

major deterrent, and imposition of a 10-year sentence will require him to spend an additional six years in prison, assuming he is awarded maximum good time credit. To the degree that the length of a punishment is at all correlated to individual recidivism, and the existing research does not support that conclusion, a 10-year sentence is more than adequate to satisfy this goal. As we have previously noted, the longest single period of incarceration he has served was 58 months, less than 50% of what he would serve here if the Court imposed a 10-year sentence.

With respect to general deterrence, in 1971 President Richard Nixon officially declared a "war on drugs." The number of Americans incarcerated for drug offenses then rose from 40,900 in 1980 to 430,926 in 2019.[8] Relatedly, there was a drastic increase in the length of sentences given for drug offenses. As noted by the Sentencing Project, in 1986 the average person spent 22 months in prison for a federal drug offense.[9] By 2004, that number rose nearly 300%, to 62 months.[10] Yet, despite locking up more people for longer periods of time, no dent has been made in combating drug use and its consequences. It is abundantly clear that drug use in the United States continues to increase and is extremely wide-spread.

The past 40-plus years of the "war on drugs" provides a clear window into the failed notion of general deterrence in the context of drug cases. More and more people

---

[8] *See* The Sentencing Project, Criminal Justice Facts, https://www.sentencingproject.org/criminal-justice-facts/ (last accessed September 9, 2021).

[9] *See id.*

[10] *See id.*

are going to jail for longer terms of imprisonment in drug cases, and yet it has deterred very few, if any. For every person removed from the street for selling drugs, there are throngs of others waiting to take that spot, and the competition to replace those arrested and incarcerated can often lead to disputes and violence. The underlying assumptions behind the government's argument that a 175-month sentence is more likely than a 120-month sentence to promote general deterrence of others who might consider engaging in drug trafficking do not stand up to scrutiny. First, there is no reason to believe that the general public, or more importantly those who are considering drug distribution, will learn of the precise length of sentence imposed by the Court in this case. Second, the government's argument assumes a rational, risk-based assessment of possible future consequences by individuals who are both (1) considering engaging in drug trafficking and (2) are also aware of the specific sentence imposed here. Third, the government's argument is predicated on a theory that a 175-month sentence will deter others, but for unexplained reasons a 120-month sentence will not.

None of the government's assumptions have empirical backing. The unfortunate reality is that general deterrence is inapplicable to the average drug offender, and to the degree it has any bearing at all on future conduct, there is no reason to believe that the impact will be changed by adding 55 months to an already lengthy 10-year sentence. Like John, many dealers have their own substance abuse problems, often coupled with mental health issues, and are not making rational decisions. Finally, the data that does exist on the concept of general deterrence does not support its effectiveness. *See., e.g.,*

Marc Mauer, "Long-Term Sentences: Time to Reconsider the Scale of Punishment"[11] ("The deterrent effect of the criminal justice system has been studied for hundreds of years, with increasing sophistication in recent decades. In regard to the impact of punishment on potential offenders, a key finding is that deterrence is primarily a function of the certainty of punishment, not its severity. Daniel Nagin, a leading deterrence scholar in the United States, concluded that '[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment' and that 'the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension'") (citations omitted); "Does Imprisonment Deter? A Review of the Evidence," Sentencing Advisory Council, Melbourne, Australia, April 2011[12] ("The evidence from empirical studies suggests that the threat of imprisonment generates a small general deterrent effect. However, the research also indicates that increases in the severity of penalties, such as increasing the length of imprisonment, do not produce a corresponding increase in the general deterrent effect"); "Do Harsher Punishments Deter Crime?," July 16, 2020[13] ("'Deterrence is very largely an article of faith,' says UNSW Law Emeritus Professor David Brown. 'I call it sentencing's dirty secret because it's just assumed that there is deterrence … but what the research shows is that the system has little to no deterrent

---

[11] Can be accessed at: https://www.sentencingproject.org/wp-content/uploads/2018/11/UMKC-Law-Review-Scale-of-Punishment.pdf

[12] Can be accessed at: https://www.abc.net.au/mediawatch/transcripts/1128_sac.pdf

[13] Can be accessed at: https://newsroom.unsw.edu.au/news/business-law/do-harsher-punishments-deter-crime

effect' ... The criminal justice researcher says harsher punishments, such as longer prison sentences, not only do not prevent crime but may actually have the opposite effect"). Accordingly, there is nothing to suggest that a sentence of 175 months will have a deterrent effect, certainly not more so than a 120 month sentence.

## CONCLUSION

All parties agree that the actions of John in this case were serious, and warrant punishment. The disagreement relates to the appropriate punishment. For all the reasons set forth in this memo, the initial sentencing memo, and as will be presented at the sentencing hearing, a sentence of 10 years, reduced to 88 months by John's time in pretrial custody, is the appropriate sentence in this case.

Respectfully submitted,

THE DEFENDANT,
JOHN MATTHEWS

September 16, 2021

/s/ Richard A. Reeve
Richard A. Reeve
Kara E. Moreau
Sheehan & Reeve
350 Orange Street, Suite 101
New Haven, CT   06511
(203) 787-9026 (phone)
(203) 787-9031 (fax)
rreeve@sheehanandreeve.com
Federal Bar No. ct05084

## CERTIFICATE OF SERVICE

       I hereby certify that this REPLY TO GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING was filed electronically and sent by first-class mail, postage prepaid, on this 16th day of September, 2021, to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

                                              /s/ Richard A. Reeve
                                              Richard A. Reeve